# EXHIBIT "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH-7
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 17th day of August, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

Case 20-31133-hdh7 Doc 75-1 Filed 09/07/21 Entered 09/07/21 12:19:09 Page 2 of 30


P R O C E E D I N G S

THE COURT: Good morning. I'll take appearances in Wall007 LLC.

MS. LINDAUER: Your Honor, Joyce Lindauer for the alleged debtors.

THE COURT: Welcome.

MS. LINDAUER: Thank you, Your Honor.

MR. PACKMAN: Good morning, Your Honor. Stephen Packman, Archer Greiner, and James Ou for the petitioning creditors.

THE COURT: Welcome to you.

MR. METZGER: Your Honor, Steve Metzger on behalf of interested party Timothy Barton, Hang Lin, as well.

THE COURT: Welcome.

MR. WALJI: Good morning, Your Honor, Khudabuksh Walji, counsel for Carnegie Development, Inc., the managing member for the Wall entities.

Thank you.

THE COURT: Welcome.

Anyone else wish to make an appearance?

MR. OU: Yes, Your Honor, James Ou, co-counsel for the petitioning creditors.

THE COURT: Welcome to you.

MR. OU: Thank you, Your Honor.

THE COURT: We have a lot of things on the

docket this morning. I think what I would like to do is hear generally from both sides on what it is you're actually wanting, what it is you think that I can do. And my intentions are then to recess the hearing. My law clerks and I will get together. And then we're going to come up with a plan of action for you that gets you toward a resolution of your disputes. So there's no magic in the order.

So, Lindauer, why don't you go first --

MS. LINDAUER: Sure.

THE COURT: -- and Packman go second.

But, you know, you have a whole slew of things on the docket. It's really unclear to me what all it is that you're wanting, what it is that you think I can do, how this further the ball down the court, what our goal is, how we're going to get this resolved, things like that. So you go first and Mr. Packman can go second. Again, there's no magic to the first and second on this.

MS. LINDAUER: Okay. Well, thank you, Your Honor.

We did file -- I know your clerk has probably had a chance to look at it, you may have, as well, a status report.

THE COURT: I have. I've had a chance to look at it.

MS. LINDAUER: Okay.

And we tried to -- because you're right, there are a

number of things pending. We tried to sort of boil it down into kind of what we view as the major disagreements here. The parties moved forward with discovery, both sides, written discovery. There has been exchanges of documents on both sides. There were answers provided to written discovery. Obviously our written discovery was a lot more extensive than their's, just because of the number of people involved on their side. You've got some 66 petitioning creditors. So obviously we had a lot more requests for information.

After doing the written discovery, I think both sides felt that the responses were somewhat inadequate, and so that's what launched sort of these motions to compel. We have since provided further discovery. I think they've provided some further discovery. But we're still missing what we view as some critical paper documents, in particular, from the petitioning creditors. While they've provided receipts that they claim of funds that were sent in, they have never provided us with, I don't think, the underlying actual transfer of funds from whatever account in China that the funds came from. We haven't been provided with complete information on each of these petitioning creditors, such as passports and identification of each of these people.

And then, as well, there were some communications provided, but we don't think as many as should have been provided, in particular, communications between the

Case 20-31133-hdh7 Doc 1076-2 Filed 10/15/21 Entered 10/15/21 12:19:40 Page 6 of 30


petitioning creditors and a gentleman named Michael Fu, who has claimed to be the agent for the petitioning creditors. We've seen very little documentation on that.

As a result of exchanging written discovery, we did take two depositions. We took Michael Fu's and Mr. Yang's depositions. And then Mr. Packman scheduled some depositions of people on our side, and then we scheduled some depositions of people on their side. And what it boiled down to, Your Honor, is that with regard to the people on our side, Mr. Packman indicated that he did not want to go forward with depositions of people on our side, unless he could take, what he calls, I think a complete deposition. And what I mean by that is he wanted to get into not only questions about the involuntary requirements, disputed claims, unliquidated claims, those issues, but also questions about the finances of each of the alleged debtors. It was at that point that we drew the line and said, wait a minute. We view the determination of whether these petitioning creditors are actually proper creditors for the filing of an involuntary to be a fundamental issue that should be decided first, before we start launching into what I would view as sort of fishing expeditions on the finances of each of these entities.

THE COURT: Hey, can I --

MS. LINDAUER: So we --

THE COURT: Can I just stop you here?

MS. LINDAUER: Sure.

THE COURT: And I don't want to step on. But do finances include whether the debtors are generally paying their debts as they become due?

MS. LINDAUER: I think that that information is available. I think we didn't draw a line on that. What we drew a line on is, is we would like balance sheets. We would like to see profit and loss statements. We'd like to see, you know, any kind of valuation information, those kinds of things. And that's where we sort of drew the line and said, wait a minute, we don't think this should be a fishing expedition on finances. As far as paying your bills as they come due, you know, those are fair questions to ask. And so, I mean, I do think they have the right to make that inquiry, Your Honor. But whether, in fact, we actually -- if you read some of their discovery it was like, let's talk about fraudulent transfers. Let's talk about preferences. Let's talk about those kinds of things. And I think those are not open for discussion at this point. So, you know, did our money go to another entity, that kind of thing. So those questions we thought really were not appropriate at this stage. They may be appropriate at some point in the future. But at least not at this stage.

So we said, look, you know, we'll produce people for depositions. But we don't think that they should have to

Case 20-31338-hdh7 Doc 75-1 Filed 09/10/20 Entered 09/10/20 12:16:09 Page 8 of 30


talk about things beyond the involuntary petition requirements. And the first requirement we believe is for you to establish that you're actually creditors of these entities. And, in fact, valid creditors with liquidated, non-contingent, non-disputed claims. So that's one box, if you will, of issues that arose was this question about what finances are the alleged debtors required to provide.

The second big issue that came up was our request to determine the validity and extent of the claims of the petitioning creditors, because we did get some written discovery. But I can tell you, we've analyzed that written discovery pretty careful and provided, you know, charts and things. But without getting into the minutia on that bottom line is, we didn't feel that we had adequate information from the petitioning creditors in order to analyze things like disputed, contingent, unliquidated, those types of issues. So we asked to take some depositions. And that's where the wheels fell of.

The alleged debtors' position, Your Honor, is that if you come to the United States and you file an involuntary petition in bankruptcy, you need to present yourself for a deposition in the United States. Every bit of research that we have done to date, and we've provided the Court with a lot of this information, leads us to conclude that taking depositions in China is likely illegal. And the other

Case 20-31138-hdh7 Doc 75-1 Filed 09/07/21 Entered 09/07/21 12:19:03 Desc 8

problem we run into is simply, Chinese persons, Chinese nationals don't follow our rules of litigation. So asking them to swear to the truth of the matters that they're going to testify about, we're not certain what that really means. How are you going to enforce that as far as those people who do show up? But we've told Mr. Packman over and over that we believe that his clients -- and we've narrowed the pool. There's about, I think, 10 or 12 of them that we've asked to depose. For particular reasons we've selected those. And we've asked that they be required to come to the United States. And I know that's problematic with COVID and all of the other things going on in the world. But maybe this just isn't the time to file an involuntary bankruptcy, if you can't make your people available to be asked questions.

Let me explain why asking those questions becomes important. We've raised questions about their signatures, whether their signatures are, in fact, authentic. Whether they actually signed a number of these pieces of paper that are relevant to this case. And we, to date, have not been satisfied that that information has really been accurate, correct, and fully vetted to really move forward in this case. So that's one issue.

The second issue, Your Honor, is our records seem to indicate that some of this money that came into the United States exceeded the limits provided by law, which means

that -- you're limited to $50,000, and some of these people transferred way, way more than 50,000. The problem is is that the money, in many instances, did not come from the people who actually signed loan agreements, we believe. And, in fact, in some instances, we have no dollars attached to a loan agreement. So there are questions about who actually sent the money, whose money is this, and who the actual borrower, if you will, really is, because we believe it may not be the person on the loan agreement.

When we took Mr. Fu's deposition, the other thing we found out was that Mr. Fu, in some instances, kept some of the money coming in on these loans to apply against a commission he claimed he was due. And that may explain in part why some of these loans have zero money funded to them. But, again, the only way we're going to get the real answer to some of those questions is to ask these people who funded the money, did you fund the money, or did somebody else fund the money? And if somebody else funded the money, then that's a bigger problem, because we have no loan agreement with that someone else. So a lot of our time, and you can see based on the attachments, has been spent trying to determine who the petitioners are, are they actually creditors, is someone else actually the creditor and not these people.

So the other big issue is taking of depositions and how

Case 20-31311-hdh7 Doc 30-1 Filed 07/21 Entered 07/21/20 18:40 Page 10 of 30


we're going to do that with regard to the petitioning creditors. And the other piece of that is their request to take depositions, as I mentioned. We do have two people that they've asked to depose that have particular issues. I don't believe Mr. Bencat (phonetic) has ever been served with his subpoena, so that's an issue. Mr. Metzger represents Mr. Barton and Mr. Lin. And then there's a woman named Saskia Badoya (phonetic) who has worked for JMJ Development, which is an underlying company. And she is now 7 1/2 months pregnant. She's had two prior miscarriages. And she's under a doctor's care. So we told Mr. Packman, we don't feel comfortable presenting her for a deposition, given her health situation. We don't want to be responsible for causing any kind of problem with her health. So those are the four witnesses they've asked for at this point. Two of them are available. Two of them have some issues.

THE COURT: Which two are available?

MS. LINDAUER: Mr. Barton and Mr. Lin.

Now, let me bring up an issue, or I'll let Mr. Metzger bring it up, but I can mention it. The Court's heard some of this previously where there's been these claims that people have threatened each other. Apparently, Mr. Lin believes his family in China has been threatened, as a result of this case and the taking of his deposition. So he has some additional concerns about actually giving his deposition and what might

Case 20-30131-hdh7 Doc 175-1 Filed 07/21 Entered 07/21 16:12 Page 12 of 30


happen. And I'll let -- Mr. Metzger has actually visited with him and he can probably explain this in better detail than I can. But apparently Mr. Lin has some concerns about appearing because of some threats that have been made to his family in China. And some of these people that we're dealing with in the United States do have family back in China, so there are some connections there.

So I think at the end of the day, I wanted to kind of hit the high points, which are the things that we're most concerned about, which is dealing with depositions, dealing with who these people are that we're dealing with, and then this question of finances of the alleged debtors. If you boil down all of the papers that have been filed, I think for the most part they fall into one of those categories that I've covered with the Court.

So Mr. Packman and I have done a fairly decent job of trying to exchange things and work together. But we just hit an impasse on these issues, and so that's why we asked to go ahead and go forward with the hearing this morning. Because I do think we need some direction from the Court how we proceed on these issues.

THE COURT: Okay.

MS. LINDAUER: And so that's why we're here.

THE COURT: I'm hoping that in a day or so, I can provide that to you.

Mr. Packman, why don't you go next, Mr. Packman. This is fresh off from Lindauer.

MR. PACKMAN: Thank you, Your Honor. Can you hear me?

THE COURT: I can hear you fine. Thank you.

MR. PACKMAN: Your Honor, in terms of the discovery requests by the petitioning creditors, we have some written discovery requests that have yet to be responded to, both in terms of document production, as well as answers to interrogatories. And we've detailed that probably more than the Court would care to read in our papers, which consists of the motion to compel. And then there's probably reference to it in responses to the alleged debtors' motions, including the motions to compel, which I'll get to in a second, and the motion to quash.

I think the responses to the interrogatories should be fairly simple, Your Honor. And I'm not going to repeat each of the requests that we feel have not been sufficiently responded to or which they didn't respond to at all. But, essentially, they're litigation questions to help us prepare for trial, such as, have any requests for -- have any admissions been made against interests? Have there been any statements against interests? Have you taken any statements from anyone? These are typical litigation questions, which I think they should answer. I don't think there's any

Case 20-10131-hdh7 Doc 175-1 Filed 07/21/20 Entered 07/21/20 16:03:12 Desc


difficult in answering those. And to the extent there are any such statements or declarations, they should just say so.

So moving to the request for production of documents. I think that Ms. Lindauer is sort of glossing over the issue of certain of these documents that we're requesting. We are not seeking to do a deep 2004 dive, yet, into the alleged debtors and their assets and business. However, to the extent that the alleged debtors are maintaining now, after having acknowledged receipt of the loan proceeds from these petitioning creditors without exception, that for some reason there's a discrepancy as to whether they are now legitimate lenders, again, after having taken their loan money and used it, or allegedly used it for the stated purpose of the loan agreements, which is to purchase land for each of the alleged debtors and to horizontally develop the land to the point where it could be sold, that we are entitled to delve into that in our discovery, including depositions of the president, of the treasurer/secretary, which is Ms. Badoya, and of these third-party witnesses who either worked for the debtor, Mr. Lin, who worked for the debtor recently or for one of the entities on behalf of the debtor, and Mr. Bencat, who has done, I believe, financial work for the debtors, and may still do so.

So we want to delve into these questions about where did the loan proceeds go? Once you took the petitioning

Case 20-31311-hdh7 Doc 175-1 Filed 09/15/20 Entered 09/15/20 17:36:40 Page 15 of 30


creditors' money, alleged debtors, what did you do with it and why do you now dispute that these debts, these loan claims are legitimate? Why are you now saying, after you took $33 million, including $20 million from the petitioning creditors, that there is a dispute -- and acknowledging receipt of those funds by Mr. Barton in writing, that there is now a dispute as to whether these debts are owed? Whether they're contingent or not, whether there's some bona fide dispute, and why it is that it is not in the best interest of the alleged debtors and the petitioning creditors to have a Chapter 7 Trustee look at what it is that happened with these loan proceeds. Because I can tell you, Your Honor, what's going to come out in the evidence is that not all of these entities, the alleged debtors, owned the land they said they were going to purchase.

And I think you've seen some of that in one of the motions for stay relief from one of the lenders. And that we believe that these loan proceeds may not even be with the alleged debtors. We don't even know if they came in properly to the alleged debtors and now they want to say that these petitions are not -- it's their defense, Your Honor -- that these petitions are not in the best interest of the alleged debtors and the creditors, but, you petitioning creditors cannot ask us questions about any of these topics during the depositions of the president of the debtor, Mr. Barton; the

treasurer or secretary, Ms. Badoya; the financial controller or outside person auditor, Mr. Bencat; Mr. Lin, who had communications with a lot of these petitioning creditors, you cannot delve into any of this. All you can ask them about are the topics that we, alleged debtors, raised in our motion to dismiss where we dispute, now, that you are real lenders or creditors. And we don't even think you exist, even though all of those petitioning creditors have provided copies of those passports to Mr. Lin. But you can't ask any questions of these witnesses about these topics. We think that is grossly improper and unfair.

Thank you.

THE COURT: Thank you.

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

Mr. Metzger, I see you on my screen. I'm picking out names right now. Why don't you go next.

MR. METZGER: Your Honor, what I would like to

Case 20-31311-hdh7 Doc 175-1 Filed 07/21 Entered 07/21 16:40:12 Page 18 of 30


really report to you is on behalf of Mr. Lin, who I represent. He is a young fellow who essentially had the job of interpretation from Chinese, Mandarin Chinese to English in connection with all of this. He really only spoke with, according to him, folks who were located in China, but who had a relationship to Michael Fu. And I don't know whether they worked for him or what. But they communicated on behalf of Michael Fu information.

Mr. Lin, when this originally came up and he was served with a subpoena, he and I talked and he was happy to testify. The next weekend, on Sunday, he spoke with his mother, who is still in China along with others of his family, Mr. Lin being currently a permanent resident of the United States, advised me that he was now quite concerned, because his mother had apparently received certain information -- he did not tell me how -- that indicated that Mr. Lin best testify in a manner favorable to the petitioners, or his family is at risk in China.

THE COURT: Where is Mr. Lin? Is he in Houston?

MR. METZGER: No, Your Honor. He is -- he resides in Frisco.

THE COURT: Frisco, okay.

MR. METZGER: Yes, sir.

THE COURT: All right. And then on Barton's

deposition, the scope that Lindauer described, that's the problem that you all have with his, right? Barton is available for deposition, right?

MR. METZGER: He can be made available for deposition. He also had a scheduling problem with the original date. He had an invitation from another Court to do something else at the same time.

THE COURT: That's a very nice way of describing things, Mr. Metzger, an invitation.

Well, I would -- you and Mr. Packman can find a date, I think, just depending on how we're going to handle this.

Anything else you want to tell me?

MR. METZGER: No, Your Honor. I'm fine with that. And I'm sure we can find a date.

THE COURT: Yeah. Let me ask, before we return -- I'm going to let Lindauer and Packman have a second bite at the apple. But anyone else on the call want to tell me anything about discovery process, that sort of thing? Because, as I said, we're going to recess this hearing for a day or so and then I'm going to come back with some guidance for everyone.

Okay. Ms. Lindauer, hearing none, you get to go second. This will be your last pass, though. Okay?

MS. LINDAUER: Fine, Your Honor.

One document I will call the Court's attention to, it's

on your docket, it's docket 64, the declaration of Tim Barton dated June 15th. That declaration addresses the receipt issue that Mr. Packman has raised. And specifically it says that -- Mr. Barton says that he believes that Mr. Fu, who I know you've heard that name. You'll hear it a lot more, I'm sure, before we're done. That Mr. Fu may have provided some misleading and false information regarding the information provided on the receipts.

So this whole situation right now with the economic situation we're facing is problematic for a lot of reasons, as the Court is gathering. The relationships between the United States and China are not particularly good right now. As well as the COVID-19 situation.

You know, our suggestion, Your Honor, is this case isn't going anywhere real quick. And it may be in everybody's best interest, frankly, just to slide things off a while and see if things get better. I am concerned about taking depositions with people in China. I do think -- I really don't want the State Department coming to my office to talk to me about why we may have broken Chinese law, as well as U.S. law right now. So we've tried to provide you some information on those issues in the briefing that we've done, Your Honor, so you can see what the concerns are. But -- and I hate to be mean to Mr. Packman but, you know, honestly, Chinese investors in the United States face a lot of hurdles.

And one of them right now, unfortunately, is the inability, perhaps, to come to the United States to support their claims.

The problem that we have with their claims, multiple problems, but one are signatures; two, identity of these people; three, how do you swear them in under U.S. law to tell the truth, nothing but the truth, so help you God, when they don't recognize our U.S. laws. So granted you can say, well, you know, maybe that falls on them and maybe their case gets dismissed, but it does create some troubling situations for us in trying to identify these people.

Let me give you a practical problem. So by law, you can transfer $50,000 to the United States, right? That's the limit. And what we have in this situation is we have some of these people that transferred hundreds of thousands of dollars, a few millions of dollars to the United States. And what we discovered in the depositions we have taken is that in many instances, they did that using the identity of other people, because that's the only way they could do it. So while you have a $50,000 limit, you might have to have six or seven people involved in transferring that money to the United States.

Now, as a U.S. company, the flip side is, is when we go to pay it back, we're supposed to pay it back to the account the money came from. And the problem we face there is, if

the money didn't come from the people that signed the loan agreements, it's not their banks that the money came from, then you can see the problem.

The other problem we ran into, and Mr. Fu was very good about describing this for us, is you have IRS issues when you transfer money back, and withholding money, and having proper accounting for those dollars. Again, another huge, big problem. So there are reasons to ask these people some questions about what they did, how they did it, who these people are, and in some instances, some of these people we show no receipts at all, which means that I think what happened was maybe Mr. Fu took their money for a commission.

So, again, when you're -- if this were a typical voluntary case, I'm not sure you would have all of these problems. But with an involuntary case where the fundamental question is, is are these undisputed, non-contingent, liquidated claims that are being asserted to support these filings to put these companies into bankruptcy, we get to, unfortunately, you have to delve into these types of questions. Are these legitimate creditors, or is the person that actually put up the money in China, the actual creditor? And so we have a myriad of those problems.

When we started to dig into questions about signatures, verifications, again, more questions popped up. So counsel went and got an affidavit from -- their paralegal went and

got an affidavit saying, yes, these are wet signatures. The problem with that affidavit is we don't know what the people were shown. Some of the responses are in Chinese.

And what's a little troubling is some of the return email addresses were to Mr. Fu and not to some other person, somebody at Mr. Fu's office. And so the Court knows, Mr. Fu was the Chinese person who raised a lot of this money and then took a several million dollar commission off of raising the money. A lot of the money was funneled through illegally his accounts. And so there's all of those issues. Now, we've deposed him. He was in Houston and we deposed him. I believe he's gone back to China now. But he was here and we were able to get some information from him. But needless to say, I think our biggest issue is trying to depose these people and get some answers.

And we've even toyed with sending them written questions for depositions. Again, you run into all of the same problems, is identifying these people who -- we raised this with Mr. Packman. You know, granted you say, well, I got these emails from these people saying, yes, I gave a wet signature. You know, we don't know who is on the other end of that email. I don't know if that was actually that person or someone else. I mean, so again, you get into all of these very technical issues which if these were voluntary cases, we probably wouldn't be going down this road. But with an

involuntary where you're talking about Chinese nationals putting American companies into bankruptcy, you know, I feel like they have an obligation, if they want to go down -- lest you forget, lest everyone forget, there was state court litigation here. And one of the things we did file with our motion to dismiss was a request to abstain. They may have a better remedy in state court than they have in bankruptcy court. Maybe they don't have to get into all of the unliquidated, non-contingent, non-disputed issues that you run into with bankruptcy. But the problem that we have is because of the requirements for an involuntary -- and an involuntary petition, as the Court knows, is a harsh remedy, putting a company in bankruptcy. So that being said, that's why all of this discovery, at least from our standpoint, becomes very, very important. And like I said, maybe the answer is is that we simply push all of this off until a time when maybe we can better do what we're asking to do.

With regard to our people's discovery and particularly Mr. Barton, Mr. Metzger addressed some of this, is some of those questions we just think are not appropriate at this juncture; whether there's been fraudulent transfers, whether funds were transferred to other companies, where the money went. We're focused on where did the money come from originally. They're wanting to focus on where did the money go. And to me that's not what you do on an involuntary. On

an involuntary you've got to establish there's a reason to put these people in bankruptcy first. Then once you prove that, then you get to the questions of fraudulent transfers, or whatever else might exist out there.

And personally, I don't know. I haven't traced the dollars, because it just doesn't become an issue yet. I don't think it's an issue. I think we have to get through the fundamental requirements of bankruptcy requirements first.

What we had suggested, Your Honor, and I don't think Mr. Packman is in agreement, though, is if we get passed the discovery issues that we're dealing with right now, is looking at maybe bifurcating this case a bit to say, okay, let's deal with these standing issues. Let's deal with who are these people that have put these companies into bankruptcy. Can they sustain motions to dismiss? Now, you've got, you know, what, seven or eight companies here. So maybe you get one, maybe you don't get the other one. Maybe you get two, I don't know. I don't know how ultimately it shakes out. Some of these have more petitioning creditors than others. But at the end of the day, I think we get through the fundamental standing questions first and then we deal with things like, okay, we've met that obligation. Now, are you paying your bills as they come due? Is this in the best interest of the creditors, assuming you are a creditor?

Case 20-10311-hdh7 Doc 175-1 Filed 07/21 Entered 07/21 09:12 Page 26 of 30


And those types of issues. And those, to me, seem to come second.

And then, Your Honor, you have the whole big issue of if we prevail and have the cases dismissed, what damages are we entitled to receive as the result of the dismissal of the case? So we had suggested, and I still think it's a good position, to maybe bifurcate this thing a little bit and deal with standing. Whether these, in fact, are truly creditors and ge that issue out there, before we go down the road with, you know, other fraudulent transfers or these other types of issues.

So I want to be sure I've hit everything. But I would call the Court's -- there's been several declarations filed by different people on the record. I'm looking at those. It might be worth some time to go back and read some of those. I think the Court would get a flavor. They're not just our's. They filed some, too. But get a flavor for some of the back and forth on some of these issues.

So I will tell you this is a unique case. I don't think I've seen anything like this. I don't know if the Court's seen anything like this. Especially with what we're dealing with right now. But our suggestion, Your Honor, maybe -- and I don't think anybody is prejudiced by this -- is possibly pushing some things off. We can get a little further down the road and hopefully maybe some of these COVID

issues settle down a bit. I think once we get past the election, things may change quite a bit, as to some of these problems that we're dealing with now.

So in any event, those are the issues. I think both of us have put them out there for you, Your Honor. They were the things that we couldn't resolve just working with each other, which is why we brought them to you.

THE COURT: Okay. Thank you.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Packman, you get the last word.

MR. PACKMAN: Thank you, Your Honor.

We're kind of confused by the explanation from Ms. Lindauer as to the dispute regarding the petitioning creditors' claims. On the one hand what I heard was that the alleged debtors don't know who to pay back and that there may or may not be tax withholding issues when they go to pay back the money. So to me, that's the quintessential problem here with their defense.

On the one hand what they say is, well, you know, we do owe the money to someone, but we're just not sure we owe it to the petitioning creditors who signed the loan agreements that we accepted, who we sent documents to, or a document that said, we've received your money and presumably we're going to use it for what we told you we were going to use it

for. And, more so, we don't want you to look at our books and records to see how we booked your loan, to see whether we booked it under your name or not. Now, I understand they want to say that when there's other participants in a loan that somehow, according to Ms. Lindauer, that renders the loan agreement invalid. I don't agree with that. I've been involved in many cases where there's a loan agreement and there's a lender, or more than one, and there's other participants who contribute to the loan, but there's one lender that gets paid back. So if it's a matter of who they need to pay back, I think we could deal with that. If it's a matter of whether they want release, global releases when they pay the money back, we can deal with that.

But what I think is going on here is, they're trying to delay this as long as possible, Your Honor, so they don't have to maybe ever pay the money back because they don't want to explain where the money went. And I do agree with Ms. Lindauer that there is some -- some of these issues are for a Chapter 7 Trustee, not for the petitioning creditors or Your Honor to decide. But to suggest that there should be some limitation on discovery to get to the bottom here of how the debtors booked these loans and whether or not they paid back interest payments on some of the early loans, which they did, and how their books and records reflect that, that goes to the heart of these matters and their defenses, as well as

the petitioning creditors' claims that Your Honor, I think, respectfully needs to hear at the time of trial on this matter.

Your Honor, we're going to try and short-circuit this case by filing a summary judgment motion immediately after these depositions. But we would like to take these depositions.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

That's all I have, Your Honor. Thank you.

THE COURT: Thank you.

All right. So I get a sense of both sides. We're going to get together in my chambers -- by the way, we had looked at everything before I came out here. Obviously you know your stuff better than I do, but we had a chance to look at everything. So expect for us either to reconvene or send you something in the next day or so.

Thank you very much. We'll be in recess.

(End of Proceedings.)

Case 20-31311-hdh7 Doc 175-30 Filed 01/07/21 Entered 01/07/21 09:40:12 Desc


C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196